# NO. 12-22-00162-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE MATTER OF E.B., JR.,* | § | *APPEAL FROM THE* |
| *A JUVENILE* | § | *COUNTY COURT AT LAW NO. 3* |
| | § | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

In this accelerated appeal, E.B., Jr. (E.B.) challenges the juvenile court's order transferring his case to adult criminal district court. In his sole issue, E.B. contends that the juvenile court erred by waiving jurisdiction and transferring the case to adult criminal district court because the State could have proceeded against him in juvenile court before his eighteenth birthday. We affirm.

## BACKGROUND

The State filed a petition for waiver of jurisdiction, in which it sought transfer of E.B. to adult criminal district court.[1] According to the State, E.B. was more than fifteen years old when he allegedly committed capital murder.[2] Specifically, the State alleged that E.B. either intentionally and knowingly caused the deaths of the victim and her unborn child by striking the victim with a deadly weapon (*i.e.* a blunt object) and setting her on fire; intentionally and knowingly caused the victim's death in the course of attempting to commit and committing the offense of kidnapping upon the victim; or intentionally and knowingly caused the victim's death in the course of attempting to commit and committing the offense of arson upon the victim. The State alleged that "after due diligence and for a reason beyond the control of the [S]tate, it was not practicable to proceed in juvenile court before the 18th birthday of [E.B.]."

---

[1] *See* TEX. FAM. CODE ANN. § 54.02 (West 2022).

[2] E.B. was sixteen when the victim was killed.

At the hearing on the State's petition, Detective Stephen Goodson of the Kilgore Police Department testified that on August 23, 2016, he began investigating a case involving Sheryia Grant, a missing person who was last seen on August 19, 2016. Goodson testified that in May 2016, when Grant was five months pregnant, Grant reported that Lanisha Young assaulted her, and Goodson investigated. According to Goodson, Allen Sutton is Young's common-law husband, and Grant was pregnant with Sutton's child. While investigating the alleged assault, Goodson learned that Sutton attempted to solicit someone to murder Grant to prevent her from giving birth. Goodson interviewed Sutton and Young, but Goodson did not believe they were honest with him. While interviewing Sutton and Young, Goodson learned that E.B. was a potential alibi witness, and another detective and a Texas Ranger interviewed E.B. at his high school.

Goodson explained that "several inconsistencies" regarding E.B.'s story came to light, so investigators decided "to dig a little further." When investigators obtained E.B.'s cell phone, they found that on the night in question, texts and phone calls from Young to E.B. "spiked." According to Goodson, Sutton was coaching E.B. via text message regarding what to tell the investigating officers during his initial interview. Goodson testified that investigators decided to interview E.B. again "to find out why he was being coached and the degree of his involvement in this." During the second interview, E.B. did not give information about the victim's location or how the victim died, and E.B. continued to support the alibi of Young and Sutton. After receiving the data "dump" from E.B.'s cell phone, Goodson learned that E.B. was communicating with Young by text messages on the night Grant disappeared, so investigators interviewed E.B. again and confronted him with said information. E.B. eventually revealed that he drove the suspect vehicle and was in the car with the victim in the front seat, but E.B. stated that he sat in the car while Grant was murdered. Goodson explained that E.B. took investigators to an area in Smith County where he said the murder occurred, and investigators conducted an all-day search there. Investigators later learned that E.B. took them to the wrong location, and Goodson believed E.B deliberately misled them.

Goodson testified that investigators re-interviewed E.B., and E.B. admitted that he drove the car, Grant was in the back seat of the car, and Sutton was in the passenger seat. According to Goodson, E.B. eventually admitted that he helped load Grant's body into the trunk after she was deceased, and that Sutton had killed Grant "by fire." At one point, E.B. claimed that Sutton stabbed Grant with a knife before setting her on fire, and E.B. later claimed that Sutton strangled Grant

and admitted that he lied about a knife being used. Goodson explained that after his final interview with E.B., he felt he did not have sufficient information about the victim's cause of death because E.B.'s version of events "changed from statement to statement."

On November 11, 2016, investigators conducted a polygraph examination of E.B., which included a pre-polygraph interview, the polygraph, and a post-polygraph interview. Goodson testified that during the polygraph interviews, E.B. stated that Sutton choked Grant until E.B. thought Grant was "asleep." E.B. told investigators that he was instructed to get a can of gasoline, and he admitted to pouring gasoline all over the victim. E.B. told investigators that after the victim was set on fire, she jumped up and ran approximately 300 feet before E.B. and Sutton dragged the victim back to the car, where Sutton struck Grant's head with a tire iron. E.B. stated that Grant collapsed, and Sutton and Young took turns beating Grant's head "until they know for a fact [that] she's dead." Goodson explained that both Young and E.B. related that Grant's baby was outside her body, and Sutton "severed the umbilical cord and wrapped them both individually before they were placed back into the trunk of the car." E.B. told investigators that after they put Grant's body in the trunk, they drove to a house in Rusk County, where they removed Grant's body from the trunk, put her body into a burn barrel, and lit her body on fire a second time, using another accelerant. Goodson testified that the State obtained Grant's medical records, which indicated that she was pregnant when she was killed.

Goodson explained that he needed corroborating evidence because he did not want to base a case solely on E.B.'s word. Goodson testified that the investigation involved three counties: Gregg County, where Grant lived and where she was lured from; Smith County, where the murder occurred; and Rusk County, where the victim's body was transported after her death. According to Goodson, investigators located the vehicle in which Grant's body was transported. Investigators found smears of blood in the trunk, and DNA testing revealed that the blood matched the victim. Investigators also found the burn barrel in April or May of 2017, after Young provided a version of events that "about 80 percent . . . matched [E.B.'s] story" and told investigators that she knew the barrel's location. Goodson testified that Young did not agree with E.B.'s account that Grant was set on fire at the initial location, and Goodson explained that during her interview, Young omitted herself from her recounting of the events that occurred. Young took Goodson to a location in Rusk County, where the burn barrel was recovered. Inside the burn barrel, investigators found bones and a "burned up cell phone" that matched the make and model of Grant's cell phone, but

DNA could not be recovered from the bones. Goodson explained that DNA evidence could not be recovered from the barrel until October 2019, when Othram Labs tested swabs from the barrel and the results matched Grant. According to Goodson, as soon as the DNA results became available, the State began the process of charging E.B.

Goodson testified that it was not practicable to present a capital murder charge against E.B. to a jury in 2017, before E.B. turned eighteen,[3] because DNA test results were pending, and authorities had not received test results from the burn barrel. In addition, Goodson explained that investigators were still obtaining phone records, search warrants, and "interviewing tons of witnesses or potential witnesses." According to Goodson, investigators still have not located Grant's body, even after assistance from the Texas Attorney General's office. Goodson testified that it was not practicable to charge E.B. before he turned eighteen. Goodson explained that E.B. poured gasoline on Grant and helped to conceal her body, and E.B. did not fully cooperate with the investigation.

At the end of the transfer hearing, the trial judge stated, "I'm going to have to come to the conclusion, based on the preponderance of the evidence, that it wasn't practicable for the State to proceed with charges" before E.B.'s eighteenth birthday. The trial judge stated, "the Court also has to take into account that part of that was due to [E.B.]'s own actions because the information that was revealed in the investigation indicates that he played a role in disposing of and concealing the alleged victim's body." The trial judge noted that if the State had filed a case before E.B.'s eighteenth birthday, "there would have been difficulties in proceeding with that. Some really serious difficulties from what the Court can tell." In its order waiving jurisdiction and transferring E.B. to criminal court, the trial court stated that it "considered by a preponderance of the evidence, that after due diligence of the State, it was not practicable to proceed in juvenile court" before E.B.'s eighteenth birthday because the investigation into Grant's death and the location of her remains "continued" and DNA evidence results were "outstanding." This proceeding followed.

## WAIVER OF JURISDICTION BY JUVENILE COURT

In his sole appellate issue, E.B. argues that the juvenile court abused its discretion by waiving jurisdiction and transferring the case to adult criminal district court. Specifically, E.B. asserts that the State failed to meet its burden of establishing by a preponderance of the evidence

---

[3] The record indicates that E.B. turned eighteen on October 21, 2017.

4

that for a reason beyond the State's control, it was not practicable to proceed against him in juvenile court before his eighteenth birthday.

**Standard of Review and Applicable Law**

When a child engages in conduct that would be considered criminal if committed by an adult, it is called "delinquent conduct." *See* TEX. FAM. CODE ANN. § 51.03(a)(1) (West 2022). Murder and capital murder committed by a minor constitute delinquent conduct. *See id*.; *see also* TEX. PENAL CODE ANN. § 19.02 (West 2019), § 19.03 (West Supp. 2022). Juvenile courts have exclusive original jurisdiction over cases involving delinquent conduct by children between ten and seventeen years old. TEX. FAM. CODE ANN. §§ 51.02(2)(A), 51.04(a) (West 2022). A juvenile court may waive its exclusive jurisdiction under certain conditions and allow transfer of the proceeding to a district court for criminal prosecution. *Id*. § 54.02(a), (j) (West 2022). "Generally, the transfer of a juvenile offender from a juvenile court to a criminal district court for prosecution as an adult should be regarded as the exception, not the rule." *In re J.W.W.*, 507 S.W.3d 408, 414 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing *Moon v. State*, 451 S.W.3d 28, 36 (Tex. Crim. App. 2014), *overruled on other grounds by Ex parte Thomas*, 623 S.W.3d 370 (Tex. Crim. App. 2021)).

In reviewing a juvenile court's written order waiving its jurisdiction under Section 54.02, an appellate court must perform a two-step analysis. *See Moon*, 451 S.W.3d at 47. First, we review the juvenile court's specific findings of fact under "traditional sufficiency of the evidence review." *Id*. Under a legal sufficiency challenge, we credit evidence favorable to the challenged finding and disregard contrary evidence unless a reasonable fact finder could not reject the evidence. *Moon v. State*, 410 S.W.3d 366, 371 (Tex. App.—Houston [1st Dist.] 2013), *aff'd*, 451 S.W.3d 28. If there is more than a scintilla of evidence to support the finding, the challenge fails. *Id*. Under a factual sufficiency challenge, we consider all of the evidence presented to determine if the court's finding is so against the great weight and preponderance of the evidence as to be clearly wrong or unjust. *Id*. We must limit our sufficiency review supporting the transfer order to the facts that the juvenile court expressly relied upon, as set out in the transfer order. *Moon*, 451 S.W.3d at 50. Second, after completing our sufficiency review, we consider the juvenile court's waiver decision under an abuse of discretion standard. *Id*. at 47. In doing so, we ask whether the juvenile court acted without reference to guiding rules or principles. *Id*. In other words, we consider whether the juvenile court's transfer decision was arbitrary. *Id*.

**Analysis**

In a transfer proceeding, the State must prove, by a preponderance of the evidence, that waiver of the juvenile court's exclusive original jurisdiction is appropriate. *Moon*, 451 S.W.3d at 40-41, 45. When, as here, the minor has reached the age of eighteen by the date of the transfer hearing, Section 54.02(j) applies to the proceeding. TEX. FAM. CODE ANN. § 54.02(j). As discussed above, the portion of Section 54.02(j) at issue in this appeal is whether the State met its burden to establish "from a preponderance of the evidence that . . . for a reason beyond the control of the [S]tate it was not practicable to proceed in juvenile court before the 18th birthday of the person . . . ." *Id*. § 54.02(j)(4)(A); *see Morrison v. State*, 503 S.W.3d 724, 727-28 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). Subsection (j)(4) "is meant to limit prosecution of an adult for an act he committed as a juvenile if his case could reasonably have been dealt with when he was still a juvenile." *Moore v. State*, 532 S.W.3d 400, 405 (Tex. Crim. App. 2017). Because Section 54.02(j) does not define "practicable," we give the term its plain meaning. *See State v. Holcombe*, 187 S.W.3d 496, 500 (Tex. Crim. App. 2006); *Lagow v. Hamon ex rel. Roach*, 384 S.W.3d 411, 416-17 (Tex. App.—Dallas 2012, no pet.). "In determining the plain meaning of a word, we initially look to dictionary definitions." *Holcombe*, 187 S.W.3d at 500. Black's Law Dictionary defines "practicable" as "reasonably capable of being accomplished; feasible." BLACK'S LAW DICTIONARY 1210 (8th ed. 2004). Similarly, Merriam-Webster's Collegiate Dictionary defines "practicable" as "capable of . . . being done or accomplished: FEASIBLE." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 974 (11th ed. 2011).

The trial court heard Goodson testify that it was not practicable for the State to pursue charges against E.B. before his eighteenth birthday because the search for the victim's body was ongoing; E.B's version of events did not fully match Young's, so corroborating evidence was needed; E.B. did not fully cooperate with the investigation; and the bones recovered from the burn barrel initially could not be forensically linked to the victim, but a lab that could perform the required DNA testing was eventually found and the results were received in October 2019. There was no evidence that the State delayed the investigation or made errors that unduly prolonged the investigation. *Cf. In re A.M.H.*, No. 12-19-00284-CV, 2020 WL 2078412, at *6-7 (Tex. App.—Tyler Apr. 30, 2020, no pet.) (mem. op.) (concluding that mistakes by the State and intentional delays in proceeding did not support the trial court's finding that it was impracticable to proceed

before Appellant's eighteenth birthday). In other words, the fact that the State had some evidence against E.B. before his eighteenth birthday, including blood from the trunk of the vehicle and E.B.'s inculpatory statements, does not mean that charging Appellant with capital murder prior to his eighteenth birthday was reasonably capable of being accomplished or feasible.

Crediting evidence favorable to the challenged finding and disregarding contrary evidence unless a reasonable fact finder could not reject the evidence, we conclude that more than a scintilla of evidence supported the trial court's finding that it was not practicable for the State to proceed against E.B. before his eighteenth birthday. *See Moon*, 410 S.W.3d at 371. Therefore, the evidence is legally sufficient to support the challenged finding. In addition, considering all of the evidence presented, the trial court's finding that it was not practicable for the State to proceed against E.B. before his eighteenth birthday is not so against the great weight and preponderance of the evidence as to be clearly wrong or unjust. *See id*. Therefore, the evidence supporting the challenged finding is factually sufficient. Because the trial court's finding was supported by legally and factually sufficient evidence, we conclude that the trial court did not act arbitrarily or unreasonably, or without reference to guiding principles. *See Moon*, 451 S.W.3d at 47. For all these reasons, we conclude that the trial court did not abuse its discretion by concluding that, for reasons beyond the State's control, it was not practicable for the State to proceed against E.B. before E.B.'s eighteenth birthday. Accordingly, we overrule E.B.'s sole issue.

## DISPOSITION

Having overruled E.B.'s sole issue, we ***affirm*** the trial court's judgment.

**GREG NEELEY**
Justice

Opinion delivered November 17, 2022
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

7



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**NOVEMBER 17, 2022**

**NO. 12-22-00162-CV**

**IN THE MATTER OF E.B., JR., A JUVENILE**

Appeal from the County Court at Law No. 3
of Smith County, Texas (Tr.Ct.No. 003-0001-22)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below be **in all things affirmed**, and that this decision be certified to the court below fort observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*